IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
LUFKIN DIVISION

| | | |
|---|---|---|
| JOSEPH ANTHONY HANZICH IV, | § § § | |
| *Plaintiff,* | § § | |
| VS. | § § | |
| | § | |
| NACOGDOCHES COUNTY, SHERIFF | § | CIVIL ACTION NO. 9:23-CV-00087 |
| JASON BRIDGES, BRYLEE GARZA, | § | JUDGE MICHAEL J. TRUNCALE |
| PRESTON JOHNSON, JACOB | § | |
| BRADSHAW, ALEXANDER RILEY, | § | |
| JUAN MERCADO, AND UNKNOWN | § | |
| JAILER, in their individual capacities | § § | |
| *Defendants.* | § | |

## ORDER ISSUING SANCTIONS

Before the Court is Defendants' Emergency Motion for Discovery Sanctions and Attorneys' Fees and Expenses. [Dkt. 28]. The Court held a hearing on this Motion on July 26, 2023. [Dkt. 34]. While the Court denies Defendants' Motion, it awards Defendants reasonable attorneys' fees and costs, pursuant to the Court's inherent sanctioning powers.

### I. BACKGROUND

Plaintiff, Joseph Anthony Hanzich IV, asserts claims against Nacogdoches County and several Nacogdoches County Jail jailers for violations of his Fourth and Fourteenth Amendment rights, and for assault with a deadly weapon. [Dkt. 1 at 7–10]. His allegations stem from an incident where multiple jailers restrained him while he was an inmate at the Nacogdoches County Jail in 2021. Jail security cameras captured and recorded this incident.

Before receiving this footage through discovery, Plaintiff's counsel, Paul Anderson, asked Defendants' counsel, Lea Correa, at their Rule 26(f) Conference on June 28, 2023, whether Defendants would object to the public release of the footage. [Dkt. 44 at 15:21–16:5]. Ms. Correa

answered in the affirmative, and told Mr. Anderson that Defendants would request a protective order in the parties' Joint Conference Report. *Id.* Mr. Anderson promised Ms. Correa that he would not make the footage public until the Court decided whether to enter a protective order. *Id.* at 16:2–5; 16:11–12. On July 10, 2023, Ms. Correa turned the footage over to Mr. Anderson in the Defendants' initial disclosures, with the following statement typed under each statement:

> Disclosed pursuant to the Parties' agreement to enter into the Court's Standard Protective Order protecting jail videos from disclosure to any person other than counsel of record, employees of counsel of record, consulting and retained expert witnesses, and the Court (under seal). This includes an agreement that the Jail videos disclosed in this case not be made public[ly] available on the internet or otherwise.

[Dkts. 28 at 4; 44 at 16:7–22].

The Court held a Rule 16 Case Management Conference ("CMC") at 2:30 p.m. on July 18, 2023. At the CMC, the Court discussed Defendants' then-pending Motion for Protective Order [Dkt. 20]. The Court agreed that a protective order should be entered, out of concern that the public release of the footage could taint the jury pool. Mr. Anderson also agreed that the Court should enter a protective order. He assured the Court and Ms. Correa that he would not release the footage, and that, to his knowledge, the FBI was the only other person or entity in possession of the footage. The Court instructed Mr. Anderson and Ms. Correa to file an amended agreed protective order, and informed them that the Court would enter the order.

Around 4:00 p.m. that same day—less than an hour after the CMC concluded—an investigative and media consulting firm posted the footage on YouTube and Facebook, in a video titled "Brutality on Video." The consulting firm posted the same video to its website the following morning. [Dkt. 37-5]. The video is captioned: "We have a jailhouse video THE COUNTY DOES NOT WANT YOU TO SEE." *Id.* at 1. It opens with a narrator announcing: "This is security camera

jail video Nacogdoches County did not want you to see. They asked a federal judge in Beaumont to seal it. Sorry, too late." *Id.*

The Court first discovered that the footage had been released when Mr. Anderson called the Court's chambers the morning after the CMC, before the Court had a chance to review and enter the parties Agreed Motion for Protective Order [Dkt. 23].[1] He expressed that he had no clue how the consulting firm received the footage. Upon watching the consulting firm's video, the Court discovered that it included not only the security footage, but also interviews of Mr. Hanzich and Mr. Anderson. Mr. Anderson is seen in the video proclaiming: "[T]he public gets to see what an inmate at a jail does to deserve having four adults pound on him, handcuff him, lynch him, put him in a chair, and then inject him with a chemical." *Id.* at 2.

Mr. Anderson testified at the July 26th hearing that he believes it was his client, Mr. Hanzich, who leaked the footage to the consulting firm. [Dkt. 122:4–5]. Mr. Anderson gave Mr. Hanzich copies of the footage, in exchange for a signed waiver, which provided:

> The law offices of Paul Anderson, PLLC are providing to client and Plaintiff Joseph Hanzich IV with a copy of Defendant's Responses to Required Initial Disclosures. Joseph Hanzich is advised of the nature of the material he is in possession of and agrees to take full responsibility for its dissemination and distribution if he so chooses. Joseph Hanzich IV understands the distribution of any material related to his case may affect his litigation or be subject to complaints, including sanctions, gag orders or restrictions on future discovery.
>
> I have had an opportunity to discuss this waiver and release with my attorney and I am knowingly, intelligently, and voluntarily releasing the Law Offices of Paul Anderson PLLC from any liability related to the release of any materials related to my case that he provides to me including video recordings and medical records.

[Dkt. 37-1] (typographical errors in original). The waiver is signed "Joseph Hanzich IV" and is dated July 11, 2023—the day after Defendants provided Mr. Anderson the footage. *Id.* When asked

---

[1] The Court entered the Agreed Protective Order at 9:47 a.m. on July 19, 2023—the morning after the CMC. [Dkt. 25].

why he made Mr. Hanzich sign this waiver, Mr. Anderson stated: "Because I felt that my client as you -- without making a medical assessment, was unpredictable." [Dkt. 44 at 19:16–17].

At the hearing, Mr. Anderson initially testified that he did not know how Mr. Hanzich met the consultant who made and released the video, nor how the consultant learned about Mr. Hanzich's case. *Id.* at 28:1–23. He eventually admitted, however, that this testimony, given in open court under oath was not true: Mr. Hanzich first met the consultant at Mr. Anderson's office in February, for an interview that Mr. Anderson had organized. *Id.* at 31:9–19. Mr. Anderson also testified that this was when the interview of him that is featured in the consultant's video occurred:

> THE COURT: Where was that -- that was taken in your law office?
>
> M[R]. ANDERSON: Yes, sir.
>
> THE COURT: And they had, like, a camera?
>
> M[R]. ANDERSON: In my conference room.
>
> THE COURT: And they had somebody with a camera?
>
> M[R]. ANDERSON: Correct.
>
> THE COURT: Did they have special lighting?
>
> M[R]. ANDERSON: No special lighting.
>
> THE COURT: But it was a camera. So you knew you were in a room with a camera and microphone, correct?
>
> M[R]. ANDERSON: Correct. The clients were -- four of -- three of my clients --
>
> THE COURT: But when you were interviewed?
>
> M[R]. ANDERSON: I was not interviewed.
>
> THE COURT: Yeah, you were. I've seen it. You're on the video.
>
> M[R]. ANDERSON: Right. He kind of pulled -- I was sitting next to him doing -- you know -- monitoring.
>
> THE COURT: No.

>M[R]. ANDERSON: And that's how I end up in it, but it was February.
>
>THE COURT: I didn't ask you when, but I appreciate the information.

*Id.* at 149:12–150:12.

Mr. Anderson also divulged to the Court—apparently to convince the Court that he did not leak the footage—that he had a different scheme to release the video:

>M[R]. ANDERSON: . . . Judge, from this lawyer's perspective, I realized that video was never going to see the light of the day. My case strategy evolved into, well, I'm just going to raise all sorts of hell about the video so that if it's never even admitted -- which likely we'll never see – it's the conduct going forth. . . . It's the awareness of the fight.
>
>THE COURT: I'm trying to understand, Mr. Anderson. Are you saying you wanted to make an issue about the Court's ruling issuing a protective order to keep the video from being released to the public?
>
>M[R]. ANDERSON: I think it would be more accurate to say that my intent was to get to a procedural place that I had a right to appeal or make –
>
>THE COURT: My decision to issue a protective order?
>
>M[R]. ANDERSON: Right. I didn't -- I'm not too – I'll confess, Judge. I'm a rookie here. I wasn't quite sure. Once you had ruled a -- on a protective order, I was honoring it. I just know I had asked for a hearing on it so that I could –
>
>THE COURT: At the hearing -- assuming there would be one -- you would admit, I'm sure, as you have admitted here, that it was a joint request for protective order?
>
>M[R]. ANDERSON: Right.
>
>THE COURT: So how could you appeal my granting a protective order that you had agreed to?
>
>M[R]. ANDERSON: Yeah.
>
>THE COURT: How do I get reversed on that?
>
>M[R]. ANDERSON: It was an agreed -- it was a joint – I'm sorry. . . . I was opposed in the protective order. . . . The -- I agreed to the protective order -- maybe illogically, I understand -- but I agreed to the protective order so that I could get the issue in front of you about the release of the video. I wanted to do it legally. I wanted to release the video lawfully through -- through -- okay -- a reversal. . . .

5

> THE COURT: So to make a spectacle of the Court's ruling on a protective order –
> . . . -- to try to get an opinion stating the Court made a mistake in entering an order that you agreed to. I'm trying to understand – . . . -- how that becomes an issue.
>
> M[R]. ANDERSON: It was never going to work in hindsight.

*Id.* at 122:24–125:3.

Ultimately, Mr. Anderson conceded that he violated his agreement with opposing counsel by giving his client the footage, and that his conduct warrants sanctions. [Dkt. 44 at 133:13–20; 145:25–146:2]

## II.   DISCUSSION

### A.  Rule 37(b)(2) Sanctions

Defendants seek sanctions under Rule 37(b)(2) of the Federal Rules of Civil Procedure. [Dkt. 28]. Rule 37(b)(2) permits sanctions against a party that "fails to obey an order to provide or permit discovery." Fed. R. Civ. P. 37(b)(2). While Rule 37(b)(2) can apply to violations of protective orders, *see Smith & Fuller, P.A. v. Cooper Tire & Rubber Co.*, 685 F.3d 486, 490 (5th Cir. 2012) ("In our view, by prescribing the method and terms of the discovery of confidential material, the Protective Order was granted 'to provide or permit discovery' of confidential documents within the meaning of Rule 37(b)."), the Court did not enter the Agreed Protective Order until after the footage was leaked and released to the public. *See* [Dkt. 25]. Because Mr. Anderson and/or Mr. Hanzich did not violate a Court order, Rule 37(b)(2) does not apply, and the Court must deny Defendants' motion.

This conclusion should not be interpreted as minimizing the seriousness of the conduct raised by Defendants' motion. The Court is deeply troubled by Mr. Anderson's conduct. Rule 37(b)(2) is simply the incorrect vehicle for sanctions under these circumstances. Instead, the Court sanctions Mr. Anderson under its inherent sanctioning power.

6

## B.  The Court's Inherent Sanctioning Power

"When a party's deplorable conduct is not effectively sanctionable pursuant to an existing rule or statute, it is appropriate for a district court to rely on its inherent power to impose sanctions." *Carroll v. Jaques Admiralty Law Firm, P.C.*, 110 F.3d 290, 292 (5th Cir. 1997) (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 50 (1991)).  "[A] court may assess attorney's fees when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Chambers*, 501 U.S. at 45–46 (internal quotation marks omitted). "The imposition of sanctions in this instance transcends a court's equitable power concerning relations between the parties and reaches a court's inherent power to police itself . . . ." *Id.* "The award vindicates judicial authority without resort to the more drastic sanctions available for contempt of court and makes the prevailing party whole for expenses caused by his opponent's obstinacy." *Hutto v. Finney*, 437 U.S. 678, 689 n.14 (1978). "A court must, of course, exercise caution in invoking its inherent power, and it must comply with the mandates of due process, both in determining that the requisite bad faith exists and in assessing fees." *Chambers*, 501 U.S. at 50. "As long as a party receives an appropriate hearing, . . . the party may be sanctioned for abuses of process occurring beyond the courtroom . . . ." *Id.* at 57.

"An agreed protective order may be viewed as a contract, and once parties enter an agreed protective order they are bound to its terms." *Moore v. Ford Motor Co.*, 755 F.3d 802, 809 (5th Cir. 2014) (Elrod, J., dissenting) (citing *Orthoflex, Inc. v. ThermoTek, Inc.*, Nos. 3:11-CV-0870-D, 3:10-CV-2618-D, 2013 WL 3095106, at *3 (N.D. Tex. June 20, 2013) (Fitzwater, J.)). Mr. Anderson conceded that by turning the footage over to his client, he violated his agreement with Defendants' counsel. While Mr. Hanzich had a right to view the footage, Mr. Anderson's decision to provide him a copy of the footage reflects, at best, poor judgment. The waiver that he

7

had Mr. Hanzich sign, however, demonstrates that this was not simply poor judgment: Mr. Anderson appreciated both the risk that Mr. Hanzich would release the footage, as well as the gravity of releasing it. *See* [Dkt. 37-1]. The Court finds that Mr. Anderson acted in bad faith when he gave Mr. Hanzich a copy of the footage, and that such conduct violated his agreement with Defendants' counsel.

Mr. Anderson's shameful conduct did not end there; how he handled this situation with the Court is equally troubling. Rule 3.03 of the Texas Disciplinary Rules of Professional Conduct is titled, "Candor Toward the Tribunal."[2] Tex. Disciplinary Rules Pro. Conduct. R. 3.03. In relevant part, Rule 3.03 provides: "A lawyer shall not knowingly: (1) make a false statement of material fact or law to a tribunal . . . ." *Id.* at 3.03(a)(1). The Court finds that Mr. Anderson knowingly, and in bad faith, made a false statement of material fact to the Court, in violation of Rule 3.03, when he testified that he knew neither how Mr. Hanzich met the consultant who made and released the video, nor how the consultant learned about Mr. Hanzich's case.

Finally, Mr. Anderson agreed to the Court entering a protective order, and swore in the CMC—albeit off the record—that he would not release the footage. He revealed at the hearing, however, that he secretly opposed the protective order all along; he agreed to it as part of a plot to get the Court reversed on appeal, so to bring even more attention to the footage. Mr. Anderson eventually conceded that this nonsensical plan "was never going to work in hindsight." [Dkt. 44 at 125:2–3]. Nonetheless, the Court is deeply disturbed by his premeditated plan to waste judicial resources to create a spectacle of the Court's ruling, for the purpose of manufacturing the public's

---

[2] The Eastern District of Texas has incorporated the Texas Disciplinary Rules of Professional Conduct in our Local Rules. *See* Local Rule AT-2(a) ("The standards of professional conduct adopted as part of the Rules Governing the State Bar of Texas shall serve as a guide governing the obligations and responsibilities of all attorneys appearing in this court. . . . Therefore, the attorney practicing in this court should be familiar with the duties and obligations imposed upon members of this bar by the Texas Disciplinary Rules of Professional Conduct, court decisions, statutes, and the usages customs and practices of this bar.").

opinion of his case. "Such conduct degrades the legal profession and mocks the search for truth that is at the heart of the litigation process." *Carroll*, 110 F.3d at 394. By agreeing to the protective order, Mr. Anderson took affirmative steps to carry out this plot. The Court finds that this conduct constitutes bad faith and a vexatious abuse of the judicial process.

Sanctioning Mr. Anderson by ordering him to compensate Defendants for their reasonable attorneys' fees and costs incurred by his conduct is consistent with the mandates of due process. First, the Court held a hearing on this matter, which provided Mr. Anderson an opportunity to demonstrate why he should not be sanctioned. Indeed, at the hearing, Mr. Anderson agreed that he should be sanctioned, and that the Defendants' expenses would constitute an acceptable sanction. *See* [Dkt. 44 at 145:25–146:2] ("[I]n conclusion, I take responsibility. With the idea of the sanctions, I will voluntarily pay these expenses."). Additionally, this is the least severe sanction available, as "[i]t is difficult to conceive of a lesser sanction that would vindicate the dignity of court proceedings and chasten [Mr. Anderson] against future misconduct." *See Carroll*, 110 F.3d at 294.

### III.   CONCLUSION

It is therefore **ORDERED** that as a sanction for his conduct discussed herein, Paul Anderson must compensate Defendants **$5,000** for their reasonable attorneys' fees and costs incurred by such conduct, **within 14 days of this Order.**

It is further **ORDERED** that Defendants' Emergency Motion for Discovery Sanctions and Attorneys' Fees and Expenses [Dkt. 28] is **DENIED.**

The Court reserves the right to issue additional sanctions against Paul Anderson and Joseph Anthony Hanzich IV during course of this litigation, including at trial, if the Court finds that their

conduct has substantially prejudiced Defendants. Further sanctions may include the Court's refusal to admit the footage into evidence at trial.

                **SIGNED this 16th day of August, 2023.**

*Michael J. Truncale*
Michael J. Truncale
United States District Judge